U.S. COURT OF APPEALS
RECEIVED
CLERK
JUN 0 1 2023
ATLANTA, GA

NO. 23-10718-DD

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

SHIRLEY WHITE-LETT. Plaintiff-Appellant

v.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION (a/k/a FANNIE MAE) et al.,
Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION
CASE NO. 4: 22-CV-82-WMR

## APPELLANT'S MOTION FOR SUMMARY DISPOSITION
## AS TO APPELLEE  FEDERAL NATIONAL MORTGAGE ASSOCIATION

## AND RESPONSE TO:

## FEDERAL NATIONAL MORTGAGE ASSOCIATION'S
## MOTION TO DISMISS APPEAL

Appellant now moves for summary disposition of her appeal as to the Appellee Federal National Mortgage Association (Fannie Mae) and further responds to its motion to dismiss this appeal and shows as follows:

**Legal Standard for Summary Disposition**

This Court recognizes the availability of summary dispositions under certain circumstances where the right clearly exists as a matter of law and time is of the essence. *Groendyke Transport, Inc. v. Davis*, 406 F.2d 1158, 1162 (5th Cir. 1969) cited in *United States v. Granda*, No. 21-14048 (11th Cir. Apr. 12, 2022) and *Wilson v. State Farm Gen. Ins. Co.*, No. 21-11722 (11th Cir. Oct. 25, 2021) (unpublished permitting partial summary disposition). As demonstrated *infra*, the ultimate facts that will decide the issues here raised have been admitted. This Court is merely asked to apply the law to those facts with regard to real property rights and interests. Mortgage foreclosure is being sought as will be noted herein and thus time is of the essence.

## JURISDICTION

Appellant initiated the underlying adversary proceeding seeking declaratory and injunctive relief to prevent each Appellee from claiming or attempting to enforce an interest in her mortgage loan and property. As Fannie Mae correctly notes in its Motion to Dismiss this appeal [see 11th Cir, Doc. 30 at p. 6], that the bankruptcy court dismissed Appellant's claims against Fannie Mae for lack of a live

controversy and her appeal to the District Court was dismissed for lack of jurisdiction because the bankruptcy court had not certified the Fannie Mae dismissal order for review under Rule 54(b). Appellant then appealed to this Court. As discussed below, this Court has statutory jurisdiction based on the claims for injunctive relief asserted in the complaint.

The Amended Complaint's title caption notes on page 1, that Appellant was seeking both declaratory **and injunctive relief.** [1] [Doc. 2 Doc. 1]. Appellant then noted on page 2 of the complaint that she was seeking declaratory relief as to each defendant[2] and injunctive relief as to each defendant because there existed conflicting claims of ownership, non-existing assignments and transfers and defects in the chain of assignments.[3]

---

[1] Appellant has already filed her opening Brief and the required Appendix. For purposes of Appellant's factual background and argument here, all document references will be to those found in the Appendix.

[2] Appellant's Amended Complaint contained separate claims for declaratory relief directed at each defendant individually to wit: The Bank of New York Mellon (Doc. 2-Doc. 1, p. 3, paragraph 87), Fannie Mae (*Id.*, paragraph 88) ; Bank of America, (*Id.* paragraph 90), and MERS (*Id.*, paragraph 91)

[3] Alleging:
  The Defendants Bank of New York Mellon (BONYM), Bank of America, N.A., Federal National Mortgage Association (Fannie Mae), Federal Home Loan Mortgage Corporation (Freddie Mac), Merscorp Holdings Inc., in its capacity as owner of Mortgage Electronic Registration Systems, Incorporated ("MERS") and RRA CP OPPORTUNITY TRUST 1, are named as defendants herein in order to determine their interests, the validity and priority (if any) of the secured status claimed as to her loan in connection to her claims for Declaratory Judgment and injunctive relief in light of conflicting ownership claims between them as revealed herein.

Ultimately, at paragraph 114 *(Id.* p. 43), she sought injunctive relief against all named defendants to prohibit them from attempting to enforce the security deed associated with her loan to the extent their interests were invalid and unenforceable.[4]

Section 1292(a)(1) provides in part:

> (a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:
>
> > (1) Interlocutory orders of the district courts of the United States, . . . granting, continuing, modifying, **refusing** or dissolving **injunctions**, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court.

### *Carson v. American Brands, Inc.,* 450 US 79 - Supreme Court 1981.

In *Carson v. American Brands, Inc.,* 450 US 79 - Supreme Court 1981, the court cited to its prior holding at footnote 11, *General Electric Co. v. Marvel Rare Metals Co.,* 287 U. S. 430 (1932), which concerned the circumstance where (as here) a party's counterclaim for injunctive relief was dismissed for lack of jurisdiction and the court of appeals found that such dismissal constituted denial of injunctive relief sought in the counterclaim:

---

[4] Alleging:

> Because Plaintiff is entitled to avoid the lien of BONYM based upon § 544(a)(3), she is entitled, for the same reasons, to a declaration that BONYM has no enforceable security interest in her property and is entitled to injunctive relief barring any future attempt by BONYM to enforce such security interest along with ALL other defendants herein to the extent that ALL such defendant's rights or interests are founded or connected to the defective, invalid and unenforceable security deed.

By contrast, *General Electric Co. v. Marvel Rare Metals Co.*, 287 U. S. 430 (1932), a case in which respondents sought to appeal the District Court's dismissal of their counterclaim for injunctive relief on jurisdictional grounds, concluded that the District Court's order did have a serious, perhaps irreparable, consequence and that it could not be effectually challenged unless an appeal were immediately taken. The Court noted that the District Court "necessarily decided that upon the facts alleged in the counterclaim defendants were not entitled to an injunction," id., at 433, and that this decision resolved "the very question that, among others, would have been presented to the court upon formal application for an interlocutory injunction." Ibid.

Making the same argument as has been raised by MERS in support of its motion to dismiss the appeal, the Plaintiff in *General Electric* contended:

The plaintiffs moved to dismiss the counterclaim for want of jurisdiction. The district court granted their motion. Defendants appealed. Plaintiffs moved to dismiss the appeal on the ground that the dismissal of the counterclaim does not amount to the refusal of an injunction under § 129, Judicial Code, and was not appealable under that section. The Circuit Court of Appeals denied the motion and reversed the order appealed from. 56 F. (2d) 823.

*General Electric* at 431]. The reasoning of the court of appeals and the Supreme Court was identical to that articulated by Appellant in her Response to MERS' motion to dismiss the appeal. For example the court continued:

[T]he court necessarily decided that upon the facts alleged in the counterclaim defendants were not entitled to an injunction. It cannot be said, indeed plaintiffs do not claim, that the dismissal did not deny to defendants the protection of the injunction prayed in their answer. The ruling of the Circuit Court of Appeals that an injunction has been denied by an interlocutory order which is reviewable under § 129 is sustained by reason and supported by the weight of judicial opinion. *Emery v. Central Trust & Safe Deposit Co.*, 204 Fed. 965, 968. *Ward Baking Co. v. Weber Bros.*, 230 Fed. 142. *Historical Pub. Co. v. Jones Bros. Pub. Co.*, 231 Fed. 638, 643. *Naivette v. Philad Co.*, 54 F. (2d)

623. Cf. *Banco Mercantil v. Taggart Coal Co.*, 276 Fed. 388, 390.[*] Plaintiffs' motion to dismiss the appeal was rightly denied.

1. <u>Even if the Dismissal Order Could Be Viewed as Insufficiently Explicit to Be Characterized as a Denial of Injunctive Relief, It is Still Appealable for Having the "Practical Effect" of Denying Such Relief.</u>

This Court has also recognized in *Carson* that; so long as the order had the "practical effect" of granting or denying injunctive relief it was appealable under § 1292(a)(1). See also, *Stovall v. City of Cocoa, Fla.*, 117 F.3d 1238, 1243 n.4 (11th Cir. 1887). Accordingly, the District Court's dismissal of the injunctive relief claims on jurisdictional grounds would in the alternative have at the least a *practical effect* of denying the injunctive relief sought against Fannie Mae. Appellant would then be required to satisfy the two prongs showing; (1) "a serious, perhaps irreparable consequence," if the relief was not granted and; (2) "that the order can be "effectively challenged" only by immediate appeal". Both of those prongs are met under the circumstances of this case. At issue is the validity of interests in Appellant's real property which she claims, as hereafter set forth in more detail, that The Bank of New York Mellon, as agent/trustee for the purported owner of her loan (Fannie Mae, who purchased the mortgage loan trust into which Appellant's loan was purportedly deposited) does not have.

"Land, under Georgia law, is deemed sufficiently unique that it is entitled to equitable remedies to protect such interest in land.[citations omitted]. Therefore, when an interest in land is threatened with harm,

equitable injunctive relief is appropriate, because **such harm is deemed to be irreparable to the unique character of the property interest, i.e., money damages are not adequate compensation to protect the interest harmed**. See generally *Central of Ga. R. Co. v. Americus Constr. Co.*, 133 Ga. 392, 398, 65 S.E. 855 (1909) (irreparable injury defined to enjoin a nuisance); see also *Roth v. Connor,* 235 Ga.App. 866, 868-869(1), 510 S.E.2d 550.

*Focus Entertainment v. Partridge Greene,* (1998) 558 S.E.2d 440 (2001) 253 Ga. App. 121.  Not too long ago this Court also noted in *Brown v. Sec'y, U.S. Dep't of Health & Human Servs.*, 20 F.4th 1385 (11th Cir. 2021).[ "Some interferences with real property interests undoubtedly constitute irreparable injuries. For example, when a party threatens to foreclose on or take another's real property, courts often deem that an irreparable injury."]

This Court may also take judicial notice of a related appeal in this Court, *White-Lett v. Bank of New York Mellon et al*, NO. 23-10732-D, where The Bank of New York Mellon, as Trustee for the trust, sought relief from the automatic stay to seek foreclosure.

Accordingly, Appellant has shown at least a "serious" or perhaps irreparable consequence," that may result if she has to await a final judgment in the District Court appeal.

The second prong—"that the order can be "effectively challenged" only by immediate appeal"---is also established for the same reasons. If Appellant is forced to await a final ruling on all pending matters in the District Court before she can

appeal, There is a substantial possibility that The Bank of New York Mellon will have completed a foreclosure sale before the appeals are decided. Thus, Appellant has satisfied the requirements also under a "practical effect" exception.

## STATEMENT OF FACTS[5]

To refinance her Cobb County Georgia home, Appellant Shirley-White-Lett executed an Adjustable Rate Note ("Note") and Security Deed to Aegis Wholesale Corporation ("AWC") dated May 17, 2005. [Doc. 2, Part I, Doc. 17, ¶ 1, incorporating her copy of the Note attached to the Amended Complaint at Exhibit H, [*Id.*, Doc. 2-1, pp. 179-184].[6]   The entity MERS (Mortgage Electronic Registration Systems Incorporated) was named in the Security Deed as acting "solely as nominee for the lender" and was the holder of only "legal title" to Appellant's interests as "Grantee". Appellant was the "Grantor". [*Id.*, Doc. 2-1, pp. 68-89 ][7].   Almost immediately after the closing of her loan, Appellant received

---

[5]  For purposes of this statement of facts, Appellant will largely refer to the documentary exhibits and evidence attached to her "Statement of Facts" submitted in support of her Motion for Summary Judgment as to Appellee Fannie Mae [Doc. 2 - Doc. 17].

[6]  Going forward it will be important to take notice that the Note Appellant attached to her complaint is the note she asserts she obtained after the closing and which she states accurately represents her signature. However, her signature appearing on subsequently surfacing multiple and varying versions of the note presented by certain appellees, *is not her authentic signature* as she compares them at paragraph 3 of her declaration. As will become clear hereafter, many more surprising revelations, even from Appellees themselves, rain down fraud on their claims regarding the Note.

[7]  The Complaint attaches the Proof of Claim filed in the bankruptcy court by the Bank of New York Mellon which in turn attached a copy of the Security Deed. The authenticity of the Security Deed is not at issue in this appeal. Rather, the issue is who (if anyone) can validly claim an interest in the Deed.

communication that her loan servicing had been transferred and that she should begin making her payments to Countrywide Home Loans. Appellant was informed some years later that her loan was part of a mortgage security identified as CWALT INC., ALTERNATIVE LOAN TRUST 2005-27, MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2005-27 ("CWALT Trust" ). [White-Lett Decl., *Id*. Doc. 17, pp. 14-15 ].  The CWALT Trust was created pursuant to the terms of a Pooling and Servicing Agreement dated June 1, 2005, among CWALT, INC., as depositor, COUNTRYWIDE HOME LOANS, INC. ("Countrywide") as a seller of mortgage loans to the Trust, PARK GRANADA LLC., also a seller; PARK MONACO INC., also a seller, PARK SIENNA LLC also a seller, with COUNTRYWIDE HOME LOANS SERVICING LP, as master servicer and THE BANK OF NEW YORK (now The Bank of New York Mellon) as Trustee. [*Id*., Doc. 17, p. 90].   The contents of a settlement agreement between Bank of America, as successor to Countrywide Home Loans, and the Department of Justice[8] reveals that Countrywide's securitizations were underwritten in gross violations of agreed-upon standards set by Fannie Mae and Freddie Mac which were to be followed if the loans were originated for purposes of selling them to Fannie Mae. The settlement agreement released Bank of America (as Countrywide's successor) from claims brought against Countrywide by the Department of Justice for violations of the

---

[8]   The Settlement Agreement is publicly available on the government's website at: https://www.justice.gov/opa/pr/bank-america-pay-1665-billion-historic-justice-department-settlement-financial-fraud-leading

Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a. [*Id.* Doc. 17, pp. 238-248]. The violations ("Covered Conduct") concerned among other things, "[t]he creation, origination, pooling, structuring, arranging, formation, packaging, marketing, underwriting, sale, or issuance prior to January 1, 2009 by Bank of America with respect to Residential Mortgage Backed Securities (RMBS) [*Id.* pp. 246-248]. The loans were sold to Fannie Mae and Freddie Mac [*Id.* pp. 301-302]. The various RMBS at issue were "*identified in Annex 4, attached [t]hereto*" [*Id.*] and included the subject CWALT 2005-27 Trust as shown in the following graphic excerpt:

Case 1:17-cv-11340-FDS    Document 9-4    Filed 08/21/17    Page 216 of 301

**Securitizations Issued by Countrywide**

**Deal Names\***

| | | |
|---|---|---|
| CPT 2004-EC1 | CWALT 2004-27CB | CWALT 2005-20CB |
| CWALT 2003-10CB | CWALT 2004-28CB | CWALT 2005-21CB |
| CWALT 2003-11T1 | CWALT 2004-29CB | CWALT 2005-22T1 |
| CWALT 2003-12CB | CWALT 2004-2CB | CWALT 2005-23CB |
| CWALT 2003-13T1 | CWALT 2004-30CB | CWALT 2005-24 |
| CWALT 2003-14T1 | CWALT 2004-32CB | CWALT 2005-25T1 |
| CWALT 2003-15T2 | CWALT 2004-33 | CWALT 2005-26CB |
| CWALT 2003-16T1 | CWALT 2004-34T1 | CWALT 2005-27 |
| CWALT 2003-17T2 | CWALT 2004-35T2 | CWALT 2005-28CB |

[*Id.*, p. 452].

While the Settlement Agreement established that the CWALT 2005-27 Trust was sold to either Fannie Mae or Freddie Mac, it does not specifically state which of these entities purchased the CWALT 2005-27 Trust.[9]  However, in a separate

---

[9] The Complaint for this reason named both Fannie Mae and Freddie Mac as defendants.

document, a Cease and Desist Order originating from contemporaneous proceedings before the Securities and Exchange Commission (*In Re: Bank of America Corporation*) relating to the same misconduct, noted in the Settlement Agreement, [10] Fannie Mae *was identified* as the GSE that served as the purchaser of Countrywide's securitizations for the period during which Appellant's loan was originated (2005). The document noted at paragraph 12:

> "From at least 2005 through mid 2008, Fannie Mae served as Countrywide's GSE "alliance partner." Under this arrangement, which Bank of America later continued, Countrywide sold most of its mortgage inventory to Fannie Mae,"

[*Id.*, p. 505, paragraph 12].

Two years after Appellant obtained her loan, AWC filed a Chapter 11 Bankruptcy in 2007 and a confirmed plan of liquidation followed in October 2010. See, *In Re: Aegis Mortgage Corporation et. al.*, United States Bankruptcy Court for the District of Delaware, Case No. 07-11119).   However, AWC had never assigned nor endorsed Appellant's Note or her Security Deed to any Countrywide entity, including Fannie Mae, or any other entity **prior to its liquidation and closing** as there is no evidence of a successor or heir to AWC [11].   On January 10, 2010, Appellant filed a Chapter 7 bankruptcy and on October 27, 2010, BONYM filed a "Motion for Relief from Stay", stating in its Motion that it was the Trustee

---

[10]   This document is also available from the Government website at:
https://www.justice.gov/iso/opa/resources/4792014829141540824781.pdf

[11]   There has been no dispute by any Appellee that AWC had no successor or heir following its liquidation and closing.

for the CWALT Trust and was the "*secured creditor*" with regard to Appellant's loan (although no deed assignment to BONYM had been recorded to this effect during such time). In support of the Motion, BONYM supplied a purported copy of Appellant's Note which did not then include an allonge. [*Id.*, p. 657 *et seq.*, and Note at. p. 682 *et seq.*].   Moreover, during litigation between Appellant and the Bank of New York Mellon (filed in the district court in September 2017), and also in the Adversary Proceeding [*White-Lett v. Bank of New York Mellon et., al.*, Case 20-06031-bem ], BONYM served upon Appellant "Initial Disclosures" which included two letters purportedly sent to Appellant during 2017, each of which attached a purported copy of the Note and each being identical to the copy attached to the above-referenced Motion for Relief From Stay *7 years earlier*.  See e.g., May 4, 2017 letter, [*Id.* at p. 690, attaching Note copy appearing at p. 742 *et seq.*,] See, also, June 2, 2017, letter appearing at p. 751, with Note attached appearing at p. 755 *et eq.*.  Notably, 5 days following the June 2, letter. Appellant was informed by a letter dated June 7, 2017, that her original loan Note had been lost and that enforcement of the Note would be attempted via a "lost Note affidavit" [see letter, Amd. Complt at Ex. H, Doc 2, Part I, at Doc. 2-1, p. 112].   Nevertheless, each of the copies attached to the May and June 2017 letters (like the one presented in bankruptcy court in 2010) contained only Appellant's and AWC's signature and no other endorsements or an allonge. These copies however were inconsistent with a

copy of the Note presented by the entity RRA CP OPPORTUNITY TRUST 1 (RRA) in a Proof of Claim it filed in Appellant's Chapter 7 case in 2020, whereby it also claimed to be the secured first lien creditor with respect to Appellant's loan *in direct opposition to the claim filed by BONYM*.  The RRA Proof of Claim [Doc 2, Part I, at Doc. 17,  p. 849, *et seq.*] contained a version of the Note that was unlike any previous version of the Note heretofore referenced or produced by BONYM and/or its mortgage servicers in that the RRA version of the Note contained an allonge—*although the allonge was completely blank with no signatures or endorsements whatsoever.* [ see, *Id.*, p. 878].  At this point Appellant pauses to expound upon what could only be charitably described as a <u>*bizarre*</u> set of facts, claims and circumstances with regard to her Note and Deed and the competing claims of ownership between RRA and BONYM.

## <u>Will the Real Owner of the Loan Please Stand Up?</u>

The circumstances now involve two totally unrelated entities both of whom made simultaneous claims to be the owner and holder of Appellant's first lien Note and Deed during the most recent proceedings in her chapter 7 case. As hereafter shown, the chapter 7 case was reopened in March 2020 and RRA and BONYM— at the invitation of the chapter 7 trustee who reopened the case—filed competing proofs of claim on the same Note and Deed **(under penalty of perjury).**  Both claimed to be the holder of the first lien Note and Deed. But as noted, RRA's  copy of the Note

included an attached allonge which was not endorsed by anyone and was simply a blank form.  However, BONYM would file a proof of claim [Complaint, Doc 2, Part I at Doc. 2-1, p. 56]  attaching a Note which (unlike any previous copy of the Note presented by BONYM), suddenly included an allonge. But unlike the RRA version of the allonge, BONYM's allonge *evidenced a complete complement of endorsements and signatures*. [see, e.g., *Id.*, p. 60].  Chandler Thompson, counsel for BONYM who filed the proof of claim *under penalty of perjury in BONYM's behalf*, described RRA's version of the note and allonge as a "mystery" [see, Doc. 2, Part I at Doc. 24, p. 10, footnote 2)] but nevertheless confirmed that RRA's copy of the Note came **" from the original lender "** [*Id.* at p. 9] stating:

> "It is no mystery that a copy **from the original lender** would find its
> way into Opportunity Trust's files."--.

Surprisingly and in contrast, as discussed more fully hereafter on p. 10 of this brief, counsel for BONYM **could not and would not confirm the origin of its own client's copy of the Note** nor could he explain why BONYM's version of the Note was not identical to RRA's copy *if indeed both copies came from the same place—the original lender?*  Yet further, in contemporaneous litigation between Appellant and another loan servicer for BONYM, (Select Portfolio Servicing, Inc. "SPS"), SPS similarly had no prior record of any Note which contained an allonge at all, let alone an allonge with endorsements. Indeed Appellant filed in this adversary proceeding a "Motion to Supplement the Record", [Doc. 3, Part II, Doc.

3] whereby she attempted to introduce internal mortgage servicing records produced in discovery by SPS evidencing not only the lack of any existing **endorsed** **Note** *as* *of 2016* but actually requesting (ordering) the production or creation of an endorsed allonge that was to reflect a "blank" endorsement from original lender AWC. The allonge was being requested because a foreclosure ("FC project") was being anticipated. The document SPS produced was a "Contact History" containing a record of mortgage servicing entries and events during the time it serviced Appellant's loan for BONYM. The first entry documented a request for an allonge to Appellant's Note entered on June 15, 2015 noting as follows [*Id.* p. 100]:

| 06/30/2015 5:36:00 AM | Note | INET | INET | User has completed the Allonge_Info data form with the following entries:<br>Why is the Document needed: : Foreclosure<br>What alternate Documents can be used: : None<br>Can Legal Action be taken if this document is not available: : False<br>Is Copy or Original Allonge Needed?: : Copy<br>Allonge From: : Aegis Wholesale Corporation<br>Allonge To: : Blank<br>Comments: : FC project |
| --- | --- | --- | --- | --- |
| 06/30/2015 5:36:00 AM | Note | INET | INET | User has updated the system for the following event:<br>Allonge Requested, completed on 6/30/2015 AutoClose from DDF |

Thus the above entry reflects a request for an allonge reflecting a blank endorsement "From: Aegis Wholesale Corporation" "To: Blank" solely for purposes of completing a foreclosure. The next entry shown below notes the completion of the allonge and noting its delivery and receipt to the "client" approximately 60 days later [*Id.*, p. 98]:

| | | | | |
|---|---|---|---|---|
| 08/19/2015 2:45:00 PM | Note | INET | INET | User has updated the system for the following event: Allonge Received by Client, completed on 08/19/2015 |
| 08/19/2015 2:45:00 PM | Note | INET | INET | User has closed the file. Close Reason: Process Complete |
| 08/19/2015 2:44:00 PM | Note | INET | INET | User has updated the system for the following event: Allonge Sent to Client, completed on 8/19/2015 AutoClose from DDF |
| 08/19/2015 2:44:00 PM | Note | INET | INET | User has updated the system for the following event: Document Requested from Client, completed on 08/19/2015 |
| 08/19/2015 2:44:00 PM | Note | INET | INET | User has completed the  Carrier_Dtl_Allonge data form with the following entries: Was Allonge Provided?: : Allonge Uploaded Comments:: : Collateral File Docs pg 8 of 8. Overnight Carrier: : Tracking Number: : |

In view of all of the foregoing fraught (if not fraudulent) circumstances facing Counsel (Mr. Thompson) due to the fact that he signed and filed the BONYM proof of claim *under penalty of perjury*, which had attached the recently created ("updated") allonge referenced in the above notes, found it necessary to distance himself from his prior statements where he averred personal knowledge and accuracy of the information contained in the proof of claim he filed. The result was the following declaration effectively and generally repudiating personal knowledge of any of the loan information attached to the claim and specifically as to the genuineness/authenticity of original loan documents he purported to have in his safe [Doc. 2 Part I, (Doc. 20, pp. 314-319)]:

> 3. **I have no personal knowledge regarding who owns Ms. White-Lett's loan,** but instead rely on information that my client NewRez LLC d/b/a Shellpoint Mortgage Servicing provided me, confidentially, for purposes of obtaining legal assistance in Ms. White-Lett's litigation. My arguments in the litigation against Ms. White-Lett regarding ownership of the loan are based on the evidence produced in the litigation and confidential information I received from Shellpoint.

4. **When I argued in state court that BoNYM owned Ms. White-Lett's loan, and Fannie Mae and Freddie Mac do not own it, I was not under oath and not giving testimony. I was making arguments based on the record and on evidence provided by my client.**

5.     I have a document in my office safe that I believe to be Ms. White-Lett's original note. I have inspected the document personally and it appears to have original wet-ink signatures, **but I have no personal knowledge regarding the signatures' authenticity. I have no personal knowledge regarding who had possession of the document before Shellpoint had the document sent to me so that I could use it as evidence in litigation.**

6.     I never heard of Ms. White-Lett and knew nothing about her loan until she sued my client in September 2017.

### MERS' Assignments of the Security Deed

Appellant now shifts back to facts and occurrences taking place a few short years following the original lender AWC's 2010 liquidation and closing, *leaving no heirs or successors.* On April 1, 2013, three years after AWC's liquidation and closing, MERS purported to execute an assignment of the beneficial interest in Appellant's Security Deed to BONYM purporting to act as the "nominee" of AWC and "*its successors and assigns*". [Doc. 2, Part I, (Doc. 17, p. 884)]. **But AWC had no known successors or assigns** after being liquidated in 2010 as noted and despite that BONYM had already purported to be the "secured creditor" *3 years earlier in its 2010 filing in Appellant's chapter 7 case.* As will be shown below from the declaration from a MERS/Merscorp officer, (William Hultman), MERS' limited

capacity as an agent for lenders is well known throughout the mortgage industry and his declaration is in fact, in its entirety, dedicated to impress upon the courts that MERS' presence and all of its actions in mortgage transactions, is simply that of a "disclosed agent" for lenders which—according to Hultman, is what its meant by the language "mortgagee of record *solely in its capacity as nominee for the lender*". It is also in this agency capacity that MERS executes mortgage assignments on behalf of its principal/lender. Hultman, the then Treasurer of Mortgage Electronic Registration Systems, Incorporated, and Senior Vice-President of Merscorp Incorporated at the relevant times, made the declaration in support of its agency arguments before the bankruptcy court in *In re Agard*, 444 B.R. 231 (Bankr. E.D.N.Y. 2011) [12]. The declaration was also filed specifically to support the proposition that because MERS executes assignments–*not on its own behalf* but on behalf of its principal/lender)-- MERS' assignments of the deeds are valid. Hultman also sought to explain the significance of the language contained in the deed concerning MERS. Hultman explained that MERS' status in the loan and loan records **never in fact terminates** despite a mortgage assignment to a new entity by MERS.  Hultman explains that MERS

---

[12]    Appellant's loan and the *Agard* debtor's loan were both consummated within months of each other and thus the Hultman declaration has temporal relevance.

"remains the mortgagee of record for the life of the loan".[13]  At paragraph 9 of his

declaration he explained [ *Id.*, Doc. 17, at p. 19 ]:

> 9.   Once MERS becomes the mortgagee of record, **MERS remains the mortgagee of record when beneficial ownership interests or servicing rights are sold from one MERS Member to another, and the transfer is tracked electronically on the MERS® System.**  At all times during this process, the original mortgage or an assignment of the mortgage to MERS remains of record in the public land records where the security real estate is located, **providing notice of MERS' disclosed role as the agent for the MERS Member lender and the lender's successors and assigns.**

MERS explains at paragraph 20, that the language in the Deed also impresses upon

the borrower and the borrower's acceptance, that MERS will be acting (not in its

own behalf) but only on behalf of the lender as the disclosed agent for the lender:

> 20.   The MERS Mortgage clearly demonstrates the Lender's delegation of authority to MERS, **and Debtor's acknowledgement and acceptance of MERS as the disclosed agent of the Lender,** and its successors and assigns.

[*Id.*, p. 23]. Hultman explained to the *Agard* court how it is that MERS could

remain the mortgagee of record "for the life of the loan" even after assigning a

mortgage to another entity. MERS' counsel, arguing before the court in *Agard,*

explained that even after MERS assigns the deed, the new assignee is

---

[13]  Hultman gave another declaration to this effect in *MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., et al., v. Bellistri,* Case: 4:09-cv-00731-CAS Doc. #: 65 Filed: 07/01/10. Citing to Hultman's declaration, the court there found:

> "Mortgage Electronic Systems, Inc. [sic] **will typically remain the mortgagee of record throughout the life of the loan;** transfers between lenders or servicing contracts are tracked electronically through the MERS® System. See Ex. 1, Aff. of William Hultman, ¶ 23.

automatically **"deemed"** to have reappointed MERS as its nominee by operation of its rules and agreements without need of an assignment. The court noted:

> In this particular case, MERS maintains that as a member of MERS and pursuant to the MERS membership agreement, the loan originator in this case, First Franklin, appointed MERS "to act as its agent to hold the Mortgage as nominee on First Franklin's behalf, and on behalf of First Franklin's successors and assigns." MERS explains that subsequent to the mortgage's inception, First Franklin assigned the Note to Aurora Bank FSB f/k/a Lehman Brothers Bank ("Aurora"), another MERS member. According to MERS, note assignments among MERS members are tracked via self-effectuated and self-monitored computer entries into the MERS database. <u>As a MERS member, by operation of the MERS membership rules, **Aurora is deemed to have appointed MERS to act as its agent to hold the Mortgage as nominee.**</u> Aurora subsequently assigned the Note to U.S. Bank, also a MERS member. <u>By operation of the MERS membership agreement, **U.S. Bank is deemed to have appointed MERS to act as its agent to hold the Mortgage as nominee**</u>. Then, according to MERS, "U.S. Bank, as the holder of the note, under the MERS Membership Rules, **chose to instruct MERS** to assign the Mortgage to U.S. Bank prior to commencing the foreclosure proceedings by U.S. Bank." (Affirmation of William C. Hultman, ¶ 12).

*In re Agard*, 444 B.R. 231, 240 (Bankr. E.D.N.Y. 2011). Hultman was careful to point out that MERS cannot—pursuant to agency law and its own rules—act on its own but can only act as instructed by its principal/lender, noting in his *Agard* declaration, that:

> On February 1, 2008, prior to commencing the mortgage foreclosure proceeding involving the Debtor and Debtor's property, **upon the direction of US Bank**, . . . *MERS executed an assignment of Mortgage . . .*"

[*Id.* p. 24, paragraph 24].

To support MERS' agency authorization, Mr. Hultman also attached to his Declaration as an exhibit, the MERS "Terms and Conditions" which also further acknowledges that MERS can only act when instructed to do so by the lender/noteholder [*Id*., p. 81, paragraph 3] which provides:

> **MERS shall at all times comply with the instructions of the holder of mortgage loan promissory notes.** In the absence of contrary instructions from the note holder, MERS shall comply with instructions from the Servicer shown on the MERS System in accordance with the Rules and Procedures of MERS.

Following the natural and automatic operation of MERS' rules, governing documents and language contained in its deeds in the instant case with respect to the MERS 2013 assignment to BONYM, BONYM is then " **deemed to have appointed MERS to act as its agent to hold the Mortgage as "nominee" for BONYM.** Consequently, under this arrangement and operation, **MERS purports to have a present and <u>continuing</u> legal interest in Appellant's real property, claiming to be the** "mortgagee of record" and holder of Appellant's legal title albeit as BONYM's appointed "agent and nominee" and is purportedly authorized to transfer Appellant's Security Deed on BONYM's behalf and upon BONYM's instructions to this day and indeed "for the life of the loan". Also at issue and subject to the same factual background, is a 2017 MERS assignment of a Second Lien Security Deed to RRA CP Opportunity Trust 1, wherein MERS is still purporting to act as the agent/nominee for the liquidated heirless lender AWC in

that transaction. [See, Assignment, Complt, Doc 2, Part I, Doc. 2-1, p. 206, and Second Lien, at pp. 195-204].

## Facts Regarding Fannie Mae's Ownership Interests in Appellant's's Loan

Although, as noted, Fannie Mae purchased the loans in the CWALT 2005-27 Trust into which Plaintiff's loan had been purportedly deposited, Fannie Mae never appeared in the record chain of assignments to the security deed. As has already been noted, other than the 2013 MERS assignment of the security deed to The Bank of New York Mellon, there were no other record assignments of the deed to any other entity *including Fannie Mae*. Importantly, as earlier noted, The Bank of New York Mellon certified to a Georgia Superior Court judge in Cobb County that Fannie Mae did not own Plaintiff's loan and that the owner of the loan was The Bank of New York Mellon:

```
16. . . . . . . . . . . . . . . . . .   THIS IS NOT A
17 FANNIE MAE OR A FREDDIE MAC LOAN. THIS IS A LOAN THAT IS
18 OWNED BY THE BANK OF NEW YORK MELLON, AS TRUSTEE FOR THE
19 LONG, COMPLICATED MORTGAGE-BACKED SECURITY TRUSTS THAT YOU
20 MENTION THAT YOU READ EARLIER TODAY.
```

[Transcript of Hearing, Doc. 2- Doc. 1, p. 165]. Additionally, the bankruptcy court found [Doc. 2- Doc. 22]:

> To date, FNMA has asserted no interest in the Property. Plaintiff alleges that Chandler Thompson has repeatedly insisted in various proceedings in state and federal court that neither FNMA nor Freddie Mac **has ever held any interest in the Property.** Neither entity filed a proof of claim in the Chapter 7 Case.

22

Moreover, Fannie Mae, in its Motion to Dismiss this Appeal to this Court, again reiterates that Fannie Mae does not own any interests in Appellant's loan:

> "As the bankruptcy court said, "[to] date, FNMA has asserted no interest in the Property." [ECF No. 2-22 at14]. As such, there is no "live" issue or controversy involving FANNIE MAE at any stage of this matter."

[See Motion, Eleventh Cir. Doc. 30, at p. 7].

 Because it is undisputed that Fannie Mae never held any interest in Appellant's loan and property and because it is undisputed that Fannie Mae purchased the loans deposited in the CWALT 2005-27 Trust from Countrywide (which the Trust does currently claim to own and seeks foreclosure, and because there has never been any assignment of Appellant's security deed to Fannie Mae *or from Fannie Mae*, the CWALT 2005-27 Trust cannot possibly own or hold any interests in Appellant's loan or her property—**despite noticing Appellant that it does**. Because Fannie Mae has no right to enforce or foreclose Appellant's loan or property for lack of any interests therein, and because The Bank of New York Mellon acts only as an agent—as "Trustee for the Certificate Holders" of the CWALT Trust, *which Fannie owns*—the Trustee likewise has no right to enforce or to foreclose on any interest in Appellant's loan on behalf of the CWALT Trust.

**Discussion and Argument**

       1.  <u>Did Appellant Have Bankruptcy Standing to Bring Her Claim Against Fannie Mae?</u>

The bankruptcy court denied declaratory and injunctive relief based on Appellant's lack of bankruptcy standing. The court appears to suggest that Appellant did not have a pecuniary interest in the case outcome. Quite simply, the bankruptcy court refused to acknowledge this Court's ruling construing Section 502(a) of the bankruptcy code to apply to chapter 7 cases. Under the express language of this statute, a Chapter 13 debtor was a party-in-interest for standing purposes. But there had been some confusion in the courts as to whether a chapter 7 debtor would also be conferred such statutory party-in-interest standing as the statutes were silent on that issue. As a result, courts fashioned judge-made rules to determine a chapter 7 debtor's standing. This Court resolved the matter by finding that Section 502(a) also applied to chapter 7 cases in *In re Westwood Community Two Ass'n, Inc.*, 293 F.3d 1332, 1336-37 (11th Cir. 2002). This Court said:

> Although no definition of "party in interest" exists in Chapter 7 of the Bankruptcy Code, Chapter 11 defines a party in interest as "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee." 11 U.S.C. § 1109 (b) (1978). Despite the fact that chapter 7 does not define party in interest, the First Circuit recognized that the right for a party in interest to be heard in a bankruptcy proceeding, as

set out in Chapter 11, also applies in a Chapter 7 case. In re Mailman Steam Carpet Cleaning Corp., 196 F.3d 1, 5 (1st Cir. 1999) (noting that "Chapter 7 includes no comparable provision, but in practice bankruptcy courts routinely entertain adversary proceedings against the Chapter 7 trustees. [citations omitted]. In light of the structure and purposes of the Bankruptcy Code, we agree with these courts that the right to be heard applies in the liquidation context."). We agree with the First Circuit that a party in interest has a right to be heard in a Chapter 7 bankruptcy proceeding. In this case, the Unofficial Committee, brought an adversary proceeding in the bankruptcy case and also moved the bankruptcy court to reconsider its allowance of claims. Under section 502(a) of the Bankruptcy Code, any claim "is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a) (1978).

Because Appellant is a "debtor" she plainly had statutory standing under section 502(a) to object to claims *which includes the right to seek declaratory judgment under Bankruptcy Rule 7001(9).*

### 2. The Bankruptcy Court Failed to Distinguish Between Challenging an Assignment and Challenging the EXISTENCE of an Assignment

As an alternative basis for denying relief, the bankruptcy court asserted in its ruling that Appellant lacked standing to challenge assignments. This assertion is not easily understood since *there are no assignments to challenge with respect to Fannie Mae*. Therein indeed lies the problem. There is no assignment of Appellant's Security Deed from Countrywide to Fannie Mae despite the undisputed purchase of the CWALT 2005-27 Trust from Countrywide. Nor is there any assignment *from* Fannie Mae to any entity. This raises the question as to whether Fannie Mae ever received Appellant's loan at all. As Chief District Court

Judge Thomas Thrash noted in *Minnifield v. Johnson & Freedman II*, LLC, 2012 WL 5463878, (N.D.. Ga. 2012:

> The Plaintiff argues that she entered into a loan agreement with Argent, for which she signed an assignable promissory note and security deed, and that another entity (Ameriquest) may have assigned the Note and Security Deed without any record of having received it from Argent. The opinion of the Court of Appeals, without explicitly addressing the standing issue, at least implicitly held that she has standing to make the argument.
>
> It is certainly true that the Plaintiff's claim is fundamentally different from one by a plaintiff who, faced with a record of the assignment and assignor's consent to transfer, argues that the assignment was invalid under, for example, the terms of a pooling agreement. **If the Plaintiff did not have standing to challenge whether the PSA Assignment took place, debtors with assignable security deeds would be in the perilous position of being unable to challenge the assertion of any entity claiming to hold the security deed, and could face multiple claims**. Accord *Livonia Props. Holdings, LLC v. 12840-12976 Farmington Road Holdings, LLC*, 399 Fed. Appx. 97, 102 (6th Cir. 2010)

To the extent the bankruptcy court found there was no live controversy simply because Fannie claimed no interests in Appellant's loan, the record inferred the contrary. Again, the CWALT Trust at issue still maintained that Appellant's loan was in that trust and there is nothing of record that shows Fannie Mae no longer owns the CWALT Trust.

## CONCLUSION

Because the admitted facts leave no question that Fannie Mae never obtained any interests in Appellant's loan and because the CWALT Trust that Fannie Mae purchased from Countrywide is the vehicle through which The Bank of New York

Mellon as the Trustee for that trust derives its right to seek forclosure, Appellant is entitled to a declaration that the CWALT Trust has no legal or valid interests in Appellant's loan and has no right to foreclose or any other rights regarding her loan. An injunction prohibiting same is also appropriate.

Dated: June 1st, 2023

By: _Shirley D. Lett_____

Shirley White-Lett

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 27 of the Federal Rules of Appellate Procedure, I hereby certify that:

1. This response complies with Rule FRAP Rule 27 (d) (2)) of the Federal Rules of Appellate Procedure because it contains 5190 words, as determined by the word-count function of Google Docs ®, excluding the parts of the response exempted from that count.

2. This response complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6 )of the Federal Rules of Appellate

Procedure because it has been prepared in a proportionally spaced typeface using Google Docs ®, in 14-point Times New Roman font.

Dated: June 14, 2023

By: _Shirley D. Lett_____
  Shirley White-Lett

## CERTIFICATE OF SERVICE

This is to certify that the undersigned served this day a copy of the forgoing pleading on all parties hereto by United States Mail in the manner required by law.

SERVED:

Federal National Mortgage Association, (a/k/a Fannie Mae)
Attorney:
Cobb, Olson & Andrle, LLC
Suite 160-B
500 Sugar Mill Road
Atlanta, GA 30350

Mortgage Electronic Registration Systems Incorporated (MERS)
Attorney:
Akerman LLP
Suite 725
170 South Main Street
Salt Lake City, UT 84101
801-907-6900
Merscorp Holdings, Inc. (d/b/a MERS)
Attorney: (same as above)

The Bank of New York Mellon
 Aldridge Pite, LLP Suite 500 -
 Fifteen Piedmont Center
 3575 Piedmont Road, NE
 Atlanta, GA 30305
 (404) 994-7400

The Bank of New York Mellon Corp.,
Attorney: (same as above)

BANK OF AMERICA, N.A.
Attorney:
McGuireWoods LLP
Suite 2100, Promenade
1230 Peachtree Street, N.E.
Atlanta
Atlanta, GA 30309
(404) 443-5728

RRA CP Opportunity Trust 1
Attorney:
McCalla Raymer, Pierce, LLC
1544 Old Alabama Road
Roswell, GA 30076
(678) 281-6473

This /St day of June, 2023.

By: _Shirley D. Lett_
    Shirley White-Lett, *pro se*
    456 North Saint Mary's Lane
    Marietta, GA 30064
    404-580-641



# CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1(a)(1) and 27-1(a)(9), Appellant Shirley White-Lett hereby submits the following Certificate of Interested Persons and Corporate Disclosure Statement. Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-2(a), Appellant hereby certifies that the following persons and entities may have an interest in the outcome of this case:

Akerman LLP, ( Attorney The Bank of New York Mellon)

Aldridge Pite, LLP,  (The Bank of New York Mellon)

Bank of America, N.A.

Burbine, Jennifer, (Attorney, Bank of America, N.A.)

Cobb, Olson & Andrle, LLC, (Attorney, Fannie Mae)

Federal National Mortgage Association, (a/k/a Fannie Mae)

Hurst, Allan, (Attorney, The Bank of NewYork Mellon Corporation)

McCalla Raymer, Pierce, LLC, (Attorney RRA CP Opportunity Trust 1

McGuireWoods LLP

Monro, Barbara-Ellis, Judge

Mortgage Electronic Registration Systems Incorporated

Merscorp Holdings, Inc.

NewRez, LLC

Ray, William H. II, Judge

RRA CP Opportunity Trust 1

Shellpoint Mortgage Servicing

The Bank of New York Mellon Corporation

The Bank of New York Mellon

White-Lett, Shirley


By: _____

Shirley White-Lett, *pro se*
456 North Saint Mary's Lane
Marietta, GA 30064
404-580-6411